Donn C. SHANNON, on behalf of himself and all others similarly situated, Plaintiff,

v.

The UNITED STATES CIVIL SERVICE COMMISSION, Robert E. Hampton, Jayne B. Spain, and L. J. Andolsek, as Commissioners of Civil Service, Defendants.

No. C–76–1364 SW.

United States District Court, N. D. California.

Dec. 22, 1977.

Gill Deford, Neal S. Dudovitz, Bruce K. Miller, National Senior Citizens Law Center, Los Angeles, Cal., for plaintiff.

James L. Browning, Jr., U. S. Atty., William T. McGivern, Jr., Asst. U. S. Atty., Civ. Div., San Francisco, Cal., for defendants.

## OPINION AND ORDER

SPENCER WILLIAMS, District Judge.

This class action challenges the procedures used by the Civil Service Commission to recover alleged prior overpayments of annuities to retired federal employees. Jurisdiction exists under 28 U.S.C. § 1331.

Retired employees receive annuities pursuant to Subchapter III of the Civil Service Retirement Act, 5 U.S.C. §§ 8331–8348. The amount of an individual's entitlement may change periodically, and is dependent upon numerous individual circumstances such as marital status, length of service, income during service and family size and age.

The amount of the basic, or gross, annuity is computed pursuant to rules laid out in the subchapter, see, e. g., 5 U.S.C. § 8339. The amount of the annuity which the annuitant receives, or net annuity, is determined by adjustments to the gross entitlement as a result of such factors as optional health and life insurance deductions or payments.

From time to time, an annuitant may receive more money in the monthly check than he/she is entitled to receive. Upon discovery of the error, the Commission notifies the annuitant of the error and attempts to recover the overpaid amount by reducing future payments until the full overpayment has been recouped. It is the Commission's policy not to reduce future payments by more than 25% in any single month.

Under 5 U.S.C. § 8346(b), the Commission shall not recover overpayments made under the subchapter when, "in the judgment of the Civil Service Commission, the individual is without fault and recovery would be against equity and good conscience." Also, 5 U.S.C. § 8347(d) provides that an individual may appeal an administrative action under the subchapter.

At the time this action was filed, July 1, 1976, annuitants subject to recoupment of overpayments were not notified of a right to contest the determination of the overpayment or to seek administrative waiver of the overpayment pursuant to § 8346(b), although the waiver and appeals sections of the Civil Service Retirement Act were in effect at that time.

Donn Shannon, the named plaintiff in this action, received notice of an $1,813 overpayment in his retirement check on November 17, 1975. In May, 1976, he was notified by letter that this overpayment would be recouped by deductions of $60 per month from his $350 annuity check for a period of thirty months. Neither communication from the Bureau of Retirement, Insurance and Occupational Health (BRIOH), which administers the annuity program, informed him of a right to challenge the fact of overpayment or the availability of waiver. Plaintiff protested the recoupment by letter and requested waiver. After getting no response from the Commission he filed suit in this court for declaratory and injunctive class relief.

In its Order and Preliminary Injunction of February 18, 1977, this court certified a nationwide class and found the Commission's recoupment procedures constitutionally inadequate. The court held that plaintiffs' interests in annuity payments and waiver were statutory entitlements amounting to property interests, protected by the due process clause.

Following an analysis of the relevant factors and case authority, the court ordered the defendants to accord annuitants certain procedural guarantees. The Commission was enjoined from recouping overpayments to Civil Service annuitants without 1) giving notice of intended recoupment and the reasons therefor, 2) giving notice of the right to waiver and the factors entering into the waiver determination, 3) giving notice of the right to a written protest to the overpayment determination and the right to request waiver, 4) informing annui-

tants of the decision on written submissions before commencing recoupment and 5) giving notice that a de novo oral evidentiary hearing will be held after recoupment has begun, at which the annuitant may be represented by counsel, present evidence and cross examine witnesses.

The court deferred its final decision on the full requirements of due process, especially on the issue of whether the waiver hearing is required before recoupment begins, pending the decision of the Ninth Circuit in *Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir. 1977).

*Elliott* has now been decided, and this case is prepared for final resolution. Plaintiff has moved for summary judgment and the defendants have moved for an order clarifying or modifying the court's Order of February 18, 1977. The parties have raised several issues to be resolved at this time: 1) whether the waiver statute, 5 U.S.C. § 8346(b), applies to overpayments which occur by reason of the Commission's failure to adjust annuities to account for health and life insurance premiums, pursuant to the REHB, FEHB, and FEGLI programs[1]; 2) whether a de novo reconsideration or waiver hearing is required prior to commencement of recoupment; and 3) what relief, if any, should be granted to annuitants who suffered recoupments before the new procedures were implemented pursuant to the court's preliminary injunction.

## I. THE SCOPE OF 5 U.S.C. § 8346(b)

This court's order of February 18, 1977, stated that: "Section 8346(b), the waiver provision, applies to all payments made to plaintiff as an annuity. The reason for the overpayment is not a factor in § 8346(b)." Defendants, in their Motion to Clarify or Modify, have asked for reconsideration of this finding. Defendants assert that § 8346(b) is not applicable where recoupment is sought for uncollected health benefits or life insurance premiums which are

normally deducted from the basic annuity entitlement.

The exact language of 5 U.S.C. § 8346(b) is as follows:

> Recovery of payments under this subchapter may not be made from an individual when, in the judgment of the Civil Service Commission, the individual is without fault and recovery would be against equity and good conscience.

The scope of the statute is determined by the language "recovery of payments under this subchapter." This refers to the monthly payment received by the retired individual under Subchapter III of the Act, 5 U.S.C. §§ 8331–8348.

However, the gross amount is not the amount of payment that the annuitant ultimately receives. The annuity may be reduced by the amount of an annuitant's FEHB health benefits premium, 5 U.S.C. § 8906, or by optional deductions for continued life insurance coverage under the FEGLI program pursuant to 5 U.S.C. §§ 8701 and 8714a(c)(2). Also, in the case of annuitants who retired before 1960, the total payment may be increased by the federal contribution to an annuitant's private health plan under REHB, Pub.L. 86–724, 74 Stat. 849 (1960), amended by Pub.L. 91–418, 84 Stat. 869 (1970). Each of these programs is administered by the Commission and financed from a different fund.

Defendant argues that "recovery of payments under this subchapter" refers only to recovery of amounts overpaid because of miscalculation of the basic annuity entitlement, i. e., errors in application of the gross annuity formulas set out in the subchapter. For the second time, the court rejects this interpretation.

The agency interpretation of a statute is generally entitled to great deference and should be sustained unless it is plainly erroneous or inconsistent with the statute. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792,

---

1. These abbreviations refer to the Federal Employees Health Benefits Act (FEHB), 5 U.S.C. §§ 8901 *et seq.*; the Retired Federal Employees Health Benefits Act (REHB), P.L. 86–724, and the Federal Employees Group Life Insurance Act (FEGLI), 5 U.S.C. §§ 8701 *et seq.*, each of which is administered by the Commission.

13 L.Ed.2d 616 (1964). Assuming arguendo that the Commission's interpretation is longstanding and entitled to deference, it is plainly inconsistent with the statute.

The defendants assert that under-deduction of health benefit or life insurance charges creates a debt owed to the respective fund, either FEHB or FEGLI, and that the statutes creating these programs do not explicitly provide for waiver. They conclude from this that the waiver statute applies only to overpayments which are reflected in the Civil Service Retirement Fund and cannot be applied to waive debts to other funds.

■ First, defendants misperceive the nature of the debt created. When an annuity is miscalculated and results in an overpayment, a "debt" is created which is owed to the Commission. This is true regardless of the source of the overpayment. The debt is not owed to the respective fund in which the deficit appears, but rather to the Commission. The funds are merely accounts administered by the Commission, see 5 U.S.C. §§ 8340, 8714, 8909.

Even if defendants' characterization of the overpayment as a debt to a fund were correct, its conclusion is too narrow. The obvious purpose of § 8346(b) is to avoid the hardship that can result from recovering overpayments from a blameless annuitant. The cause of the overpayment is immaterial to the impact on the annuitant. By the language of the statute, Congress did not differentiate the various funds within the Commission when it authorized waiver of recovery from an innocent retired employee.

■ The language of § 8346(b) is clear in its application to Commission recovery of *any* amounts incorrectly paid to an annuitant in his retirement check. "Payments

under this subchapter" refers to the whole check the retired person receives monthly (or in a lump sum under 5 U.S.C. § 8342). The statute directs a limitation on recoupment of "payments." It does not direct a limitation on recovery for particular Commission mistakes. The statute's clear language cannot be reasonably construed to apply only to recoveries or overpayments which are traced solely to miscalculation of a gross annuity entitlement.

The legislative history of the waiver statute supports this interpretation. The waiver statute was first enacted in 1944 in response to the hardship that arose when annuitants who had been given annuities during a prior period of ineligibility were cut off entirely until those prior overpayments were recouped. H.R.Rep.No. 1396, 78th Cong., 2nd Sess., (1944) *reprinted in* U.S.Code Cong.Serv. p. 1151. At that time, the statute referred to recovery of "annuities." In 1956, the scope of the statute was expanded by replacement of the term "annuities" with the word "payments." The specific impetus for the change was to enable recipients of lump sum overpayments under the Act to be considered for waiver. S.Rep.No. 2642, 84th Cong. 2nd Sess., (1956) *reprinted in* U.S. Code Cong. and Admin.News, pp. 3725, 3737. Congress used a broad term to expand the scope of the statute to prevent inequity in a situation that previously had not been covered by the statute. This broad language encompasses the overpayment which is traced to the health benefits or life insurance programs which are administered by the Commission. Moreover, although subsequent legislative history shows some lack of clarity in Congressional purposes, it is too sparse and inconclusive to warrant a strained contrary reading of the statute.[2]

2. In 1970, Congress, as part of a legislative package affecting both retirement health benefits programs (REHB and FEHB), inserted a waiver statute substantially identical to § 8346(a) into REHB alone. Pub.L. 91–418, subs. 4(a)3, 84 Stat. 869. Defendants argue that this shows a Congressional understanding that § 8346(b) was not applicable to REHB

overpayments and that therefore a new waiver statute was needed. Defendants argue that, by implication, Congress believed that FEHB and FEGLI underdeductions also were not eligible for waiver consideration under § 8346(b). Defendants conclude that Congress did not intend § 8346(b) to be applied to recovery of amounts

The statute's terms clearly apply to all payments under the Civil Service Retirement Act. The purpose of the Act indicates that the source of the overpayment should be immaterial. It would be a strange rule indeed if the right to be considered for waiver depended on the category into which a bureaucratic error falls. In these circumstances, without persuasive Congressional history showing a specific purpose to limit § 8346(b) to gross annuity miscalculations, this court declines to hold that Congress intended such an interpretation.[3]

■ The plaintiff argues that the waiver statute would apply to any effort by the Commission to collect a debt, however unrelated to annuity payments. This carries the statute too far. Section 8346(b) refers to *recovery* of payments of annuity. When the Commission seeks to collect a debt for another agency, it is not attempting to recover an annuity. The debt was not creat-, ed by an excess annuity payment, as is the case when overpayments are caused by failure to deduct health or life insurance premiums.[4]

In sum, the earlier holding that § 8346(b) applies to all attempted recoupments of prior overpayments made to retirees as an annuity is affirmed. The reason for the overpayment is not a factor in § 8346(b).

## II. THE REQUIREMENTS OF DUE PROCESS

Pursuant to the February 18 Order, the defendants have developed proposed procedures for recoupment which are outlined in federal regulations 5 C.F.R. §§ 831.1301 *et seq.* (1977), the affidavits and exhibits before the court, and the memoranda of the parties. As to recoupment beginning after June 1, 1977,[5] BRIOH gives notice to the annuitant of the alleged overpayment, the reasons for the overpayment, and the right

overpaid because of failure to deduct for these programs.

Defendants' argument calls for convoluting the language and purpose of the statute on the basis of a weak inference which may not be apt. There are many reasons why Congress may have amended the REHB program with a waiver statute and not FEHB, including inadvertence or an abundance of caution. Under REHB, *direct payments are made to recipients* to cover a portion of their private health care premiums. The FEHB and FEGLI programs do not involve direct government payments to annuitants. The record does not show whether REHB payments were always tacked onto the annuity check or not. Congress may have felt the need, out of an abundance of caution, for a special provision to cover overpayments of direct health contributions. Without more illuminating legislative history, this court declines to make the weak inference.

3. Defendants suggest that annuitants are sufficiently protected by the general compromise of claims statute, 31 U.S.C. 952(b), which allows agency heads to forgive debts owed the agency where collection is impractical. This is irrelevant to our interpretation of the waiver statute.

4. In its Supplemental Motion to Clarify, the defendants ask the court to limit the scope of its injunction to the class of individuals whose setoffs were related to the four programs administered by the Commission's BRIOH— namely, the Civil Service Retirement Act, REHB, FEHB, and FEGLI.

The class previously certified was so limited and the court reaffirms this limitation. The February 18 Order reflected certification of a nationwide class of annuitants "who have suffered or who are now threatened with reduction of their monthly annuities *because of alleged prior overpayments*" without being afforded due process protection (Order at p. 4 (emphasis added)). The court restrained defendants from recouping *overpayments* to annuitants without extending certain procedural protections (Order at p. 14). This expressly limits the application of the injunction to controversies related to prior annuity payments for which the Commission seeks partial recovery. It does not include the situation where the Commission sets off a debt owed to another agency which is unrelated to a prior annuity check.

This limitation is consistent with the conduct of this action. Although Civil Service debt collection practices on behalf of other agencies have been discussed incidentally in this case, these practices have not been briefed or otherwise put before the court. Therefore, without commenting on what due process requires of the Commission when it collects a debt owed another agency, the scope of this Order is limited to the "recovery of overpayment" circumstances listed above.

5. The procedures which must be afforded earlier recoupees are discussed *infra*.

to seek reconsideration, compromise [6] or waiver. 5 C.F.R. 831.1302a (1977). The standards for determining waiver are included in the notice.[7]

The request for reconsideration, waiver or compromise must generally be filed within 21 days of notice. The annuitant is entitled to submit any written material to be considered in this initial decision. The Bureau must then issue a written decision. If the decision is adverse to the annuitant, recoupment begins in the next check. No oral waiver hearing is provided before recoupment begins.

The annuitant may request a de novo evidentiary hearing within 30 days of *any* adverse decision. However, the defendants now request that the court's final order limit the constitutional right to an oral hearing to waiver claims and those classes of reconsideration claims which involve issues of credibility and veracity.

The hearing is held before the Federal Employees Appeals Authority (FEAA). At the hearing, the annuitant is entitled to cross-examine witnesses, be represented by counsel, and present his case. The FEAA then recommends a decision to BRIOH, which issues the decision.

Finally, there is an appeal procedure for a review of a prior decision on the record. If the annuitant ultimately prevails, the Commission will refund the amounts it has already recovered. (Tinsley affidavit, July 19, 1977.)

The plaintiff asserts that the defendants' proposed procedures will not satisfy due process in that 1) oral evidentiary hearings on the waiver issue are not given before recoupment begins, and 2) no hearing will be available at any time on the reconsideration issue where credibility and veracity is not a significant factor. Plaintiffs do not claim that a prerecoupment hearing is required on the reconsideration issue where credibility and veracity are not factors, but merely that due process requires an oral hearing before the recoupment becomes final.

As noted in the order granting the preliminary injunction, plaintiffs are entitled to due process with regard to the deprivation of their property interests in annuity payments and waiver:

Plaintiff's interest in the receipt of his monthly annuity benefits is a statutory entitlement and is therefore a constitutionally protected property interest under the due process clause of the Fifth Amendment to the United States Constitution. *Mathews v. Eldridge*, 424 U.S. 319, 332 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976). *Cf. Arnett v. Kennedy*, 416 U.S. 134, 166 [94 S.Ct. 1633, 40 L.Ed.2d 15] (1974); *Board of Regents v. Roth*, 408 U.S. 564, 576–78 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972). The annuitant also has a protected property interest in the right to waiver of recoupment by the Commission. 5 U.S.C. 8346(b) establishes a statutory entitlement to waiver if the annuitant comes within its provisions. An entitlement exists allowing plaintiffs to establish that they fall within the eligibility criteria established by the statute, *Board of Regents v. Roth*, 408 U.S. 564, 577 [92 S.Ct. 2701, 33 L.Ed.2d 548] (1972).

In determining what process is due in this situation, the court is reminded that "due process is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481, [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). The Supreme Court has held that, as a general principle, "some form of hearing is required before an individual is

---

6. Defendants have suggested that the waiver statute does not apply to FEGLI, FEHB, or REHB deduction errors. Rather, they suggest that the general compromise of claims statute, 31 U.S.C. 951 et seq., applies to these mistakes. Since the waiver statute applies to all annuity overpayments, there is no need to rule on what due process requirements surround the compromise determination.

7. Defendants' original regulations put the burden on the annuitant to show that waiver would not be contrary to the purposes of the Civil Service Retirement law. Defendant has agreed with plaintiffs, however, that this misplaces the burden on the annuitant and will amend its regulations accordingly.

finally deprived of a property interest." Moreover, there must be an "opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo*, 380 U.S. 545, 552 [85 S.Ct. 1187, 14 L.Ed.2d 62] (1965)." *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902.

· A. *The Waiver Hearing*

The issue presented here is whether the Commission's deferral of the oral de novo evidentiary hearing until after recoupment has begun violates the flexible dictates of due process. This court holds that it does.

The court's analysis of this issue is guided by the Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and the Ninth Circuit's opinion in *Elliott v. Weinberger*, 564 F.2d 1219 (9th Cir. 1977). Both are progeny of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in which the court held that a prior hearing was required before welfare payments could be terminated by government agencies.

*Eldridge* held that Social Security disability payments could be terminated without a prior oral hearing in circumstances where 1) there was a review of the recipient's written objections before termination; 2) a full administrative hearing after termination, and 3) a right to retroactive payment if the recipient prevailed at the hearing.

The *Eldridge* court articulated a three-step test for determining the specific requirements of due process:

. . . identification of the specific dictates of due process generally requires consideration of three distinct factors: first, *the private interest* that will be affected by the official action; second, *the risk of an erroneous deprivation* of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the *Government's interest,* including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 335, 96 S.Ct. at 903. (emphasis added)

Applying this test to the termination of Social Security disability payments, the court held that no prior oral hearing was required on the issue of the continued existence of the disability, i. e., that available procedures were sufficient.

In these circumstances, the court found that the private interest in uninterrupted receipt of payments pending final administrative decision was less than that of the terminated welfare recipient in *Goldberg v. Kelly*, 397 U.S. 254, [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970), since disability payments were not based on need and did not necessarily leave the recipient without the "very means by which to live." *Eldridge*, 424 U.S. at 340–41, 96 S.Ct. at 905. However, the court noted that the difference could be overstated and that the hardship could be significant. 424 U.S. at 341–42, 96 S.Ct. at 905.

The court found the risk of erroneous deprivation of benefits to be minimal under the procedures for pre-termination written review in light of the issues involved. The disability determination required a "medical assessment of the worker's physical or mental condition . . . ." This is a more sharply focused and easily documented decision than the typical determination of welfare entitlement." 424 U.S. at 343, 96 S.Ct. at 907. Since the decision to discontinue disability payments turned upon " 'routine, standard and unbiased medical reports' " by doctors, issues of credibility and veracity were not significant. 424 U.S. at 344, 96 S.Ct. at 907. Written submissions were sufficiently reliable, and a prior oral hearing would have added little to the process.

Finally, the *Eldridge* Court found the public interest in deferring hearings until after termination "not insubstantial," due to 1) the dubious ability of Social Security to recover payments to ineligible recipients, 2) the increased number of hearings that would result from a prior hearing option and 3) the delay in termination that prior hearings would cause, 424 U.S. at 347, 342 n.26, 96 S.Ct. at 909. In sum, the court felt that fairness did not require a prior oral hearing in these circumstances.

Addressing itself to attempts by Social Security to recover prior overpayments to beneficiaries, the Ninth Circuit in *Elliott v. Weinberger*, distinguished the facts of *Eldridge* and held that a hearing was required before recoupment commenced. *Elliott* considered the situation in which Social Security determines that it has paid beneficiaries more than their legal monthly entitlement. While the Secretary of HEW generally may recoup these overpayments, 42 U.S.C. § 404(b) provides, in part,

> there shall be no . . . recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or be against equity and good conscience.

The Secretary provided recipients with an opportunity to have the recoupment decision reviewed before recovery began. This review was limited in scope to consideration of written material submitted by the recipient regarding either the existence of the overpayment or the entitlement to waiver. A full de novo hearing was available, but only after recoupment was commenced.

The court analyzed these procedures in the light of the test laid down in *Eldridge*. The private interest in undiminished receipt of benefits was characterized as lying somewhere between *Eldridge* and *Goldberg*. At 1231. While Social Security payments were not the last step before destitution, payments were partially need-based so that erroneous recoupment could cause "financial disaster,". 564 F.2d at 1231.

Although the private interest, was insufficient, by itself, to require prerecoupment hearings, the court found that the risk of an erroneous waiver decision was analogous to the risk of error in *Goldberg*, and much greater than that in *Eldridge*. Whereas disability termination in *Eldridge* required evaluation of dry medical information submitted by impartial witnesses, waiver required analysis of the recipient's fault, financial dependence and detrimental reliance, among other factors. 564 F.2d at 1231–32. These issues turned largely on the credibility and veracity of the recipient

and would be difficult to resolve on the basis of written submissions.

The court found the government interest in immediate recoupment prior to any oral hearing less than the government interest in *Eldridge*. Unlike *Eldridge*, there was no requirement to make continued payments pending appeal to possibly ineligible persons who could not repay amounts received in the interim. 564 F.2d at 1235. Therefore, the fiscal impact on the government would be less than in *Eldridge* or *Goldberg*. Moreover, to the extent that increased hearings led to more correct waiver determinations, the court felt that the interest of the government, as expressed in the waiver statute, was promoted.

Thus, on balance, the court ordered the Secretary to provide pre-recoupment hearings on the waiver issue.

█ In applying the foregoing principles to the instant case, this court concludes that due process requires a pre-recoupment hearing on the issue of waiver of Civil Service annuity overpayments.

1. The Private Interest

As in *Elliott* and *Eldridge*, the Civil Service annuitant's "sole interest is in the uninterrupted receipt of benefits pending final administrative decision" of claims for waiver of overpayments. *Elliott*, 564 F.2d at 1230, *Eldridge*, 424 U.S. at 340, 96 S.Ct. at 905. Since full retroactive reimbursement is given if the annuitant prevails, the interest is limited to avoiding the *temporary* reduction of annuity.

In one sense, the plaintiffs' interest here is less than the plaintiffs' in *Eldridge*. Only a portion of monthly payments are recouped under the Civil Service recoupment procedures, whereas the plaintiffs in *Eldridge* were faced with a termination of all benefits.

Also, as was the case in *Eldridge* and *Elliott*, the annuity is not the last bulwark against starvation. Welfare and other sources will be available if benefits are reduced. Therefore, plaintiffs' interest in benefits is less than the welfare recipient's interest in *Goldberg*.

The annuitant's interest is roughly analogous to the recipients' interest in *Elliott.* Social Security benefits are designed primarily to provide income to individuals after their income-productive years are past. This is an identical function to that served by Civil Service annuities. Although Social Security is a more basic social welfare program than Civil Service retirement payments, benefit levels under both programs are set by Congress and based in part on income before retirement. Both are intended to replace income that is lost through retirement and provide for the needs of the retired individual.

The situation of the named plaintiff in this action illustrates the similarity of the private interest in Civil Service annuity and Social Security payments. Mr. Shannon, at the time this suit was filed, received a $351 Civil Service annuity and a $178 Social Security check (Affidavit of Donn Shannon). Recoupment of an $1,800 overpayment from either source would have had an identical impact on him.

In sum, although the loss does not reach the severity of that threatened in *Goldberg,* the loss occasioned by recoupment should not be minimized. The deprivation of a significant portion of fixed income can be a substantial loss indeed. Retired individuals living on fixed income frequently can ill afford even a moderate temporary decrease in their disposable income. As in *Eldridge,* "the hardship imposed . . . may be significant," and the difference from *Goldberg* can be "overstated." 424 U.S. at 342, 341, 96 S.Ct. at 906.

### 2. The Risk of Erroneous Deprivation

The relevant inquiry in the waiver determination is established by 5 U.S.C. § 8346(b), which provides that annuity overpayments should not be recovered when the annuitant is "without fault and recovery would be against equity and good conscience." The regulations define fault, equity and good conscience. 5 C.F.R. §§ 831.-1403, 831.1404 (1977).[8] Relevant considerations in the fault determination include the

8. The full text of these regulations is as follows:

§ 831.1403 *Fault.*

(a) Determinations of 'fault' or the absence thereof, will be made according to the commonly understood and standard concepts of equity applicable thereto.

(b) A prerequisite to waiver of overpayments shall be a clear and convincing showing that the person from whom recovery would otherwise be made did not cause, or was not otherwise responsible for the overpayment, i. e., he or she performed no act of commission or omission that resulted in the overpayment. Pertinent considerations to be made in this area are:

(1) Whether payment resulted from the individual's incorrect (not necessarily fraudulent) statement.

(2) Whether he or she knew the payment was erroneous and, if so, whether his or her subsequent failure to act resulted from desire or ignorance.

(3) Whether he or she failed to disclose material facts in his or her possession.

(4) Whether he or she could have determined that the payment was erroneous.

§ 831.1404 *Equity and good conscience.*

(a) 'Equity and good conscience' as defined in equity and the commonly understood meaning thereof shall attach to waiver determinations. In addition, the decision must be made whether the exercise of waiver of over-

payment would be in opposition to the basic purpose of subchapter III of chapter 83 of title 5, United States Code, and would injure the administration of such subchapter.

(b) The following guides will also be applied as appropriate.

(1) Waiver of overpayment may be granted when an individual by reason of receipt of the overpayment has (i) relinquished a valuable right or (ii) changed his or her position for the worse.

(2) Waiver of overpayment may be granted when an individual (or his/her family) would be left in a worse financial position after our recovery of the overpayment or if recovery is by withholding installments from annuity, such withholding constitutes a definite hardship to the recipient or his/her family.

(3) Waiver of overpayment may be granted when the individual has consistently acted in good faith regarding the overpayment and such waiver would not be contrary to the Commission's responsibility as defined in subchapter III of chapter 83 of title 5, United States Code, to protect the Civil Service Retirement and Disability Fund.

(4) Waiver of overpayment cannot be granted when the individual has been found to be at fault or if the overpayment has been obtained by fraud. Fraud absolutely precludes the waiver of an overpayment so obtained.

annuitant's knowledge of the overpayment, motive for continued failure to act, ability to recognize an overpayment and role in causation of the error by act of omission or commission. The equity and good conscience determinations are equally subjective. Among other relevant factors are the reliance of financial dependence and good faith of the annuitant.

These issues are uniformly difficult to determine on the basis of written submissions. Questions of subjective knowledge, motive, reliance, good faith and ability to recognize errors all require an appreciation of the credibility of the annuitant and consideration of all the relevant circumstances in the claimant's position.

The waiver issue under § 8346(b) is substantially identical to the waiver issue which was examined in *Elliott*. The statutes which create the waiver entitlement are substantially identical. *Compare* 42 U.S.C. 404(b) *with* 5 U.S.C. 8346(b). The inquiries they require are "significantly different from those faced in the disability insurance termination in *Eldridge,* and more closely resemble those addressed in *Goldberg.*" *Elliott,* 564 F.2d at 1232.

Termination of disability in *Eldridge* turned primarily on medical judgments of doctors. While some subjective issues would be raised, they would be the exception. In contrast, the waiver determination turns on the claimants' credibility and veracity regarding the circumstances surrounding the overpayment. As noted in *Goldberg* and *Eldridge,* "in such circumstances, 'written submissions are a wholly unsatisfactory basis for decision'" *Eldridge,* 424 U.S. at 344, 96 S.Ct. at 907, quoting *Goldberg v. Kelly,* 397 U.S. at 269, 90 S.Ct. at 1021 (1970). Moreover, in *Eldridge,* the written review process was preceded by extensive agency fact-finding and communication with third-party professionals. This is not the case here.

The conclusion of the Ninth Circuit in *Elliott* with regard to the risk of error applies with equal force in this case:

> . . . the decision which must be reached in a fault determination is highly subjective, highly individualized, and highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation. *Elliott,* 564 F.2d at 1233.

The equity and good conscience standards raise questions of a similar nature. The risk of erroneous deprivation of annuity benefits is greatly increased by the Commissioner's current system. The system does not afford the annuitant an opportunity to adequately explain the circumstances of his case to the decisionmaker.

3. The Government Interest

Consideration of the public interest involved in denying pre-recoupment oral evidentiary hearings includes analysis of the fiscal and administrative burdens associated with the procedure. *Eldridge,* 424 U.S. at 335, 96 S.Ct. at 905. The extra burden associated with a pre-recoupment hearing beyond that imposed by post recoupment hearings consists of 1) whatever delay occurs in the onset of recoupment by virtue of the prior hearing, and 2) whatever increase occurs in the aggregate number of hearings sought by virtue of the availability of a prior hearing. Although these burdens are real, the defendants overestimate their weight.

Defendants' central contention is that many more hearings will be requested if the court orders that recoupment cannot begin until the annuitant is afforded a hearing. Thus, defendants argue, aggregate costs will be increased. In addition, defendants argue that prior hearings will significantly delay recoupment, thereby burdening the Retirement Fund unduly.[9] However, there has been no showing that this increase or delay will materialize. Moreover, the Com-

---

**9.** Of course, to the extent that increased hearings lead to a larger number of correct waiver determinations, the government interest is benefitted. *See Elliott,* 564 F.2d at 1234–1235.

Defendants assume that the increased number of hearings will reflect a larger number of frivolous claims for waiver, motivated by a desire to delay recoupment.

mission is in a position to minimize these burdens.

The major circumstance in which the aggregate number of requested hearings might increase is if recoupment could be significantly delayed by invoking a prior hearing. There is little incentive for the frivolous claimant to go to the trouble of invoking a hearing if it will not delay recoupment, even if it precedes the onset of recoupment. Therefore, if the Commission provided a swift pre-recoupment hearing, the number of increased meritless hearings conceivably would not increase significantly.[10]

In this case, the record does not disclose how promptly the Commission plans to afford hearings. In his affidavit of June 7, 1977, BRIOH Director Tinsley noted that equal employment opportunity hearings are conducted within thirty days because of a statutorily-imposed urgency. Clearly, then, the Commission can also provide a relatively speedy pre-recoupment hearing.

A swift procedure would remove much of the incentive for invoking a prior hearing to the claimant who would not have invoked a subsequent hearing. It also would reduce the time before which recoupment could begin to replenish the Retirement Fund.

In *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) the defendants also argued that a pre-deprivation hearing would increase the number of hearings. The Supreme Court responded to these claims in part as follows:

> . . . the State is not without weapons to minimize these increased costs. Much of the drain on fiscal and administrative resources can be reduced by developing procedures for prompt pre-termination hearings and by skillful use of personnel and facilities." 397 U.S. at 266, 90 S.Ct. at 1019.

Therefore, expensive undue delay need not be a by-product of this holding.

In *Eldridge,* the Court felt that a prior hearing would increase the number of hearings requested dramatically—"the fact that full benefits would continue until after such hearings would assure the exhaustion in most cases of this attractive option," 424 U.S. at 347, 96 S.Ct. at 909. However, termination of all benefits was threatened in *Eldridge,* and the hearing procedure exceeded one year. 424 U.S. at 342, 96 S.Ct. at 906. In this case, only partial reduction is threatened and the timing of the hearing has not been established. In these circumstances, we decline to hypothesize that the number of hearings, and thus the aggregate costs, will increase excessively.

The government burden in this case is significantly less than in *Goldberg* or *Eldridge* in two important respects. First, a prior hearing in both cases required the government to continue making payments to individuals it had determined were no longer eligible for any benefits. In contrast, in the Civil Service recoupment context, the overpayment has already been stopped. The prior hearing simply precedes the starting date for recoupment. The government need not and does not continue overpaying ineligible claimants.

Second, in *Goldberg* and *Eldridge,* the continued overpayments probably could not be recovered from the recipient if the termination decision was eventually sustained. The *Goldberg* Court stated, "the benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped, since the recipients are likely to be judgment-proof. 397 U.S. at 266, 90 S.Ct. at 1019. Also, in *Eldridge* the Court stated that the right to recover undeserved benefits would probably not be of any practical value, apparently because of the limited resources of most recipients. 424 U.S. at 342 n.26, 96 S.Ct. at 906.

10. Defendants have also suggested that prior hearings should not be required because they are so expensive that it will be impractical to collect small overpayments. This assertion is without merit. Even if we accept defendants' highest final estimate of average cost/hearing (approximately $500), the resultant burden does not outweigh the private interest. The cost per hearing is identical whether it occurs before or after recoupment. In any event, plaintiffs' interest in annuity and waiver is a protected property interest, and when that loss is not de minimis, the cost of minimal protection must be borne.

The danger that overpayments will not be recoverable if recovery is deferred pending a hearing is minimized in the annuity recoupment context. The annuity will continue to be available for setoff in most cases and the retired annuitant's eligibility will generally continue past the completion of the hearing. As the Ninth Circuit noted in *Elliott:*

> In the instant case we merely require the government to exercise a little forbearance before taking money from the claimants via recoupment. There will be few if any situations when payments will be made to ineligible persons during the course of the review. 564 F.2d at 1235.

In sum, the government interest in this case is closer to that in *Elliott.* While the number of hearings may increase, appropriate recoupment is only delayed. Irretrievable overpayments are not continued. Moreover, the length of delay and the level of increase in hearings is largely in the control of the Commission.

A balancing of these three factors compels the conclusion that due process requires that annuitants be afforded a pre-recoupment hearing on the issue of waiver. While the private interest in continuous receipt of undiminished benefits may be no greater than the private interest in *Eldridge,* it is substantial nonetheless. Moreover, the risk of erroneous deprivation is much greater where waiver is at issue than where medical condition is at issue. Finally, the burden on the government in deferring recoupment pending a hearing is significantly less than the government interest in *Eldridge* or *Goldberg.* Therefore, a prior oral evidentiary hearing must be afforded to insure fairness.[11]

**B.** *Requirements for the Reconsideration Decision*

Although defendants' current procedures include a post-recoupment de novo oral hearing on the issue of the existence of the overpayment, they request that the court exclude from its final order a requirement of any oral hearing at any time where credibility and veracity are not at issue. Defendants argue that no purpose is served by an oral hearing requirement where the credibility of claimants' assertions is not a genuine issue.

Plaintiffs admit that a *prior* oral hearing is not generally required where only reconsideration of the overpayment is at issue. However, they insist that due process requires a *post-recoupment* hearing even on the simpler issue of the existence of the overpayment.

This court agrees with defendants that due process does not require a post-recoupment oral evidentiary hearing where credibility and veracity are genuinely not in issue. As noted above, "due process is flexible and calls for such procedural protection as the particular situation demands." *Eldridge,* 424 U.S. at 334, 96 S.Ct. at 902. While some form of hearing is required before deprivation of a property interest,

---

11. The court recognizes that the Eastern District of Pennsylvania has recently held that the Social Security recipient is not entitled to a pre-recoupment hearing. *Mattern v. Mathews,* 427 F.Supp. 1318 (E.D.Pa.1977). This is in direct conflict with the Ninth Circuit opinion in *Elliott.*

In *Mattern,* the court suggests that the waiver determination does not present any greater risk of erroneous decision than the medical determination in the Social Security disability context in *Eldridge.* This court disagrees. The waiver provisions present numerous issues which require the trier of fact to examine the state of mind and the subjective capacities of the claimant, as well as the factual circumstances of the overpayment. This is markedly different from the determination required in *Eldridge.* *Mattern* also held that the public interest affected by a prior hearing was not "materially unlike" the burden in *Eldridge,* 427 F.Supp. at 1327. This neglects the fact that in recoupment situations overpayments were not continued and recovery would not be prejudiced by a prior hearing.

Finally, *Mattern* reads *Eldridge* as limiting the right to prior hearing to the situation of the welfare recipient on "the very margin of existence." This reading is unduly narrow. It is the balance of the factors which determines the dictates of due process, not solely the gravity of the private interest. Procedural fairness has regard for all factors in the balance.

For these reasons, the reasoning of *Mattern* will not be followed herein.

the question is "what type of hearing will satisfy due process." *Ong v. Tovey*, 552 F.2d 305, 307 (9th Cir. 1977). The hearing need not always be oral. In the instant case if the only issue raised is the fact of the overpayment and the evidence submitted raises no significant questions which turn on the credibility or veracity of any witness, a pre-recoupment reconsideration based on written submissions *and* decided by a neutral finder of fact satisfies the dictates of due process.

However, the record does not show the mechanics of agency discovery of overpayment, or the manner in which overpayments commonly occur. The July 1, 1977 Tinsley affidavit indicates that adjustments to annuity occur in a wide variety of circumstances. Accurate determination of some of the issues raised by these circumstances may involve significant questions of credibility and veracity. In that class of cases, written submissions alone would be inadequate. As in *Elliott*, where a class of cases arises in which the credibility of the claimant may be determinative of the outcome, "the claimant should be entitled to an oral pre-recoupment hearing." *Elliott* at 1235.[12]

## III. RETROACTIVE RELIEF TO CLASS MEMBERS

In its February 18 Order the court certified a class which included those annuitants who have suffered a reduction of monthly payments because of alleged overpayment. However, the preliminary injunction was directed to future recoupment and therefore was prospective in nature. The issue of what relief should be afforded annuitants who have been subject to recoupment in the past without prior notice of the right to seek waiver must also be decided.

Since the preliminary injunction, the defendants have begun to extend some due process protection to recoupees. However, the Commission proposes to extend no procedural rights to individuals who suffered a final recoupment before the March, 1977

check. As to persons who experienced a final recoupment deduction in March or April, the Commission proposes to afford the full review process to those who come forward and seek recoupment. A full refund will be available if the annuitant succeeds but no notice of a right to review will be sent to these individuals. Annuitants subject to ongoing or initial recoupment in the May check have been given subsequent notice of their rights under the new regulations. Recoupment apparently continues on many checks, although it is discontinued pending an initial administrative decision if the annuitant requests review.

The government relies on the administrative difficulty of reconstructing names and circumstances of pre-March recoupees as its basis for failing to extend due process to these individuals. It argues that the computer tapes which record annuity payments are generally saved for only one year and currently go back no further than roughly the time this suit was filed. Notifying and processing reconsideration and waiver requests of annuitants whose checks were subject to a completed recoupment prior to that time would require manual examination of each annuitant file.

The defendants also argue that administrative costs render notice to March and April final recoupees impractical. BRIOH Director Tinsley estimates that there are roughly 6,000 people in this group and that mailing notice to this group could cost in excess of $100,000. Moreover, BRIOH asserts that this notice would unnecessarily unsettle annuitants.

The defendants urge that the court's Order be limited in effect to those recoupments begun after the February, 1976 Order in this case or, in the alternative, those begun after the suit was filed on July 1, 1976. Plaintiff urges the court to give relief to all annuitants whose substantive claim for refund is not yet barred by the applicable statute of limitations.

12. An annuitant could always contest the existence of the overpayment at the prerecoupment waiver hearing, insofar as there can be no fault where an overpayment has not occurred.

The court's duty is to fashion appropriate equitable relief for the plaintiff class. This requires, among other things, consideration of the best interests of Civil Service annuitants, the fairness of retroactive relief, the burden on the government and the deprivation suffered by annuitants recouped wrongfully in the past.

The Supreme Court has noted the discretionary power of the Court to determine the proper scope of retroactive relief in fashioning an injunction to remedy a constitutional violation in *Lemon v. Kurtzman*, (*Lemon* II), 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (*Lemon* I) the Court had invalidated a Pennsylvania statute which permitted reimbursement of private sectarian schools for non-religious educational services as a violation of the Establishment Clause of the First Amendment. On remand, the District Court enjoined payment to the schools for services rendered pursuant to the statute after the *Lemon* I decision. However, the lower court refused to enjoin payment to the schools for services rendered prior to the *Lemon* I decision.

In affirming the lower court in *Lemon* II, the Court stated:

> In shaping equity decrees, the trial court is vested with broad discretionary power . . . . Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs'. 411 U.S. at 200, 93 S.Ct. at 1469.

Thus, while we have regard for the constitutional interests involved in this case, we are reminded that "[i]n equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests . . . ." 411 U.S. at 201, 93 S.Ct. at 1469.

Although a court may deny retroactive relief where the burdens are excessive and the issues are ill-suited to class resolution,[13] there are cases which give full retroactive relief to recipients of government benefits who have been victims of constitutional violations. *See Jimenez v. Weinberger*, 523 F.2d 689 (7th Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (Denial of disability benefit increments for illegitimate children born after the onset of disability ruled unconstitutional; notice and back payments ordered for all affected past applicants); *Grubb v. Sterrett*, 315 F.Supp. 990 (W.D.Ind.1970), *aff'd mem*, 400 U.S. 922, 91 S.Ct. 187, 27 L.Ed.2d 182 (1970) (held; class of AFDC recipients denied some payments under an illegal regulation one and one-half (1½) years old are entitled to notice, reconsideration and back payments if successful.) There is also authority for giving a lesser degree of retroactive relief in similar cases. *See e. g., Cardinale v. Mathews*, 399 F.Supp. 1163 (D.C.D.C. 1975), (less specific notice to all SSI recipients of right to challenge certain benefit reductions ordered in light of administrative burdens.)

---

13. Defendant suggests that the reasoning of *Society for Individual Rights v. Hampton*, 63 F.R.D. 399 (N.D.Cal.1973), aff'd, 528 F.2d 905 (9th Cir. 1975), counsels a denial of relief to individuals who were recouped before this suit was filed. In that case, Judge Zirpoli enjoined the Civil Service Commission's practice of terminating homosexual federal employees solely on the basis of their homosexual status. The court enjoined future discharges but declined to order reinstatement and backpay for the unidentified members of the plaintiff class who had been terminated for that reason. The court stated "in view of the difficulties of discovering members of this class and giving them appropriate notice, retroactive relief cannot be granted. Moreover, the court is not prepared to hold that no members of this class may be discharged under any circumstances from any position." 63 F.R.D. at 401. The case does not support defendants' position.

The *Hampton* decision was based in part on the difficulty of resolving the individual issues of reasons for discharge in a class setting. That difficulty is not present in this case. Refunds to all annuitants is not the remedy here. This court does not intend to supervise the hearings which are held. Also, there has been no showing that the burden on the government in the instant case is analogous to that which the plaintiffs would have imposed on the government in *Hampton*.

In the instant case, defendants have provided the court with little concrete evidence of the burdens it will face if it is ordered to give notice of the right to reconsideration and waiver to all annuitants who have been subject to recoupment since the waiver statute was enacted. We do not doubt that the cost would be substantial. Many annuitants are affected and the Commission's easily retrieved computer records are not available before July of 1977. It obviously would be burdensome to require notice and an opportunity for hearing and refund to all annuitants subject to recoupment in the past.

Also, we recognize that a waiver hearing would be an idle act in many old cases, insofar as neither party would be able to reconstruct the circumstances of the overpayment. In addition, the applicable statute of limitations may bar the annuitant's substantive claim for refund. Moreover, the extreme hardship that erroneous recovery can cause will have passed in most old cases since recoupment will have been completed and full annuity payments will have been resumed long ago. Therefore, the court declines to order defendants to extend notice to all annuitants who have ever had alleged overpayments recovered without notice and an opportunity to seek reconsideration and waiver.

However, all annuitants subject to recoupment for overpayments since the filing of this action are entitled to notice of their procedural rights to reconsideration and waiver consideration. Since the apparatus for oral hearing and written reconsideration has already been established and the Commission can retrieve the relevant records from its computer tapes for this period, the burden on the government of additional notice hearings and eventual refunds is not excessive.

It is understandable that it took time to implement procedures after the February 18 Order; therefore, recoupments after March need not be refunded pending administrative review. However, once notice is received and procedural review invoked, no further recoupment may be made until the relevant review has been afforded.

In addition to the above relief, there is no reason to foreclose annuitants who suffered full recoupment prior to initiation of this suit from invoking these procedures. While notice to all annuitants or identification of all affected individuals seems overly burdensome, any annuitant who has a claim for refund which is not time-barred should be permitted, if he/she comes forward, to challenge the Commission's determination. The passage of time does alleviate the impact of the reduction on the annuitant, but this cannot justify a denial of administrative review to an individual who challenges a recoupment on his/her own initiative. Given the absence of procedural protection to annuitants at the time of recoupment, it would be inequitable to foreclose that remedy to them here, assuming that their substantive claims are not time-barred.

The defendants suggest that this case is entitled to be given non-retroactive effect under the authority of *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). However, *Huson* considers the retroactive effect of a separate decision, rather than the scope of relief to be afforded in the case before a court. In contrast, the case before this court is what relief is appropriate for the plaintiff class. There is no issue of the retroactive effect of other decisions. However, assuming arguendo that the *Huson* analysis may have some application here, it does not support defendants' position.

*Huson* considers the retroactivity issue outside the criminal law context, and articulates three factors which should be considered in determining the nonretroactive effect of a decision. The Court states:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision *to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied*, see, e. g., Hanover Shoe v. United Shoe Machinery Corp., supra [392 U.S. 481], at 496 [88 S.Ct. 2224, 20 L.Ed.2d 1231], or by decid-

ing an issue of first impression whose resolution was not clearly foreshadowed, see, e. g., *Allen v. State Board of Elections, supra* [393 U.S. 544], at 572 [89 S.Ct. 817, 22 L.Ed.2d 1]. Second, it has been stressed that '*we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.*' *Linkletter v. Walker, supra* [381 U.S. 618], at 629 [85 S.Ct. 1731, 14 L.Ed.2d 601]. Finally, we have weighed the inequity imposed by retroactive application, for "*[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity. Cipriano v. City of Houma, supra* [395 U.S. 701], at 706 [89 S.Ct. 1897, 23 L.Ed.2d 647]. 404 U.S. at 106–107, 92 S.Ct. at 355 (emphasis added)

Thus, in order to deny plaintiffs any retroactive relief, our holding regarding the due process rights of recouped annuitants must establish a new principle of law. If it does, the court must decide whether retroactive application will promote or hinder the operation of the announced rule, and whether inequity will result from retroactive application.

No new principle of law has been applied in holding that due process applies to recoupment of Civil Service annuity overpayments. The annuity and the waiver entitlement are statutory entitlements which constitute protected property interests. As such, they are protected by the due process clause and, since *Goldberg v. Kelly,* there can be little doubt that where such interests are implicated, some process is due.

Defendants argue that *Mathews v. Eldridge* sets forth flexible standards and that it would be "oppressive" to require the Commission "to have had foresight of the proper application of the broad standards of *Eldridge.*" This misses the point. The issue in *Eldridge* was whether a pre- or post-deprivation hearing was required. The re-sult in that case does not determine the result here. It only sets forth the framework for analysis. Before Donn Shannon filed this suit defendants were affording annuitants virtually no procedural protections against an erroneous overpayment or recoupment decision. Although annuitants may have received notice of the overpayment and impending recoupment, they were not informed of a right to contest the determination, to appeal, to seek waiver or challenge the deprivation in any way. In short, defendants were not extending to plaintiffs some of the basic elements of due process which have been established since before *Eldridge* and which were reaffirmed in that decision. *See, e. g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Mullane v. Central Hanover Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). This decision does not create a new principle of law so that nonretroactive application is appropriate.

However, even if we assume that our decision does create a new principle, defendants would not be able to restrict our holding to solely prospective application. First, retroactive application of the right to challenge the determination of the Commission promotes the purposes of due process protection and the waiver statute. See *Jimenez v. Weinberger,* 523 F.2d 689 (7th Cir. 1975). Fairness suggests that the individual who is deprived of a property interest is entitled to contest that deprivation in a meaningful manner. Fairness also requires reasonable steps to insure an accurate waiver determination. Moreover, while the hardship of recoupment may have subsided for individuals recouped in the past, it does not "retard" the operation of the statute to grant some retroactive relief.

Finally, in weighing the inequity and hardship imposed on the government by extending some retroactive relief, the court finds that the equities are with the plaintiffs. Defendants have shown a significant disregard for their obligations to annuitants

under the waiver statute and for the well-documented developments in the law of procedural due process for recipients of government benefits. Therefore, the court will not limit the scope of its relief to prospective overpayment recovery.

## IV. ORDER

IT IS THEREFORE ORDERED that a permanent injunction shall issue enjoining defendants from recouping overpayments from Civil Service annuitants without:

1. Giving notice informing the annuitant of a) the proposed recoupment and the basis therefor, b) the procedural rights available to the annuitant as set forth herein, and c) the consequences if the annuitant exercises those rights.

2. Providing an evidentiary hearing on a waiver request prior to the initiation of recoupment wherein the annuitant may be represented by counsel, if desired, and may present evidence and cross-examine witnesses. This same procedure must be made available to annuitants whose requests for reconsideration raise significant questions of credibility and veracity.

IT IS FURTHER ORDERED that:

1. Defendants give notice of the right to request reconsideration or waiver to those annuitants who have suffered recoupment of alleged overpayments since the date of the filing of this action. Where amounts have already been recovered, immediate refund is not required, but future recoupment is prohibited until the procedural review has been afforded the annuitant.

2. As to those annuitants whose annuity payments were recouped prior to the date of the filing of this action, permitting those who come forward to invoke the procedural protections outlined in this order so long as their claims are not barred by the applicable statute of limitations. Neither notice of these procedures nor prior refund pending administrative review is required to be sent to annuitants in this category.